We'll call the case in number 221463 of Christian Santos Garcia versus Attorney General Garland. Ms. Wagner, you may proceed when you're ready. Ms. Wagner Thank you, Your Honor. May it please the court, Jessica Wagner for the petitioner Christian Santos Garcia. The immigration judge here heard hours of testimony from Christian and his relatives, reviewed documentary and photographic evidence, an expert report, and hundreds of pages of country condition submissions. After considering this evidence, the IJ granted Christian relief on three separate occasions, yet each time the BIA inexplicably reversed. Christian has three bases for relief, any of which is sufficient to grant the petition. The BIA's rejection of each of his claims was infected by legal error, either from failing to apply this court's precedent or by ignoring conclusive record evidence or both. First, Christian is entitled to statutory withholding of removal on account of persecution for his membership in a particular social group, or PSG, composed of young male relatives of his cousin Emily. So on that, on that counsel, what, on the particularity analysis, what, given that your client identified that as a group, how do we know what the, what the barriers, what the contours, what the limitations are of young males who are family members of his cousin Emily? Focusing on young, how do we know who's young, who's not young? Tell me how we know the boundaries of that group, given that part of it. So I, your honor, I think it's important to remember that under this court's precedent, and that's the Temuv case, we have to... Well I know the argument that we can't look at just young. We have plenty of cases where we do look at the component parts, and, and you may be right, maybe we shouldn't be doing that. But assume for the second we're supposed to actually consider the terms of the group that are involved here. If I have to consider young, and whether it's particular or not, how do I know what the boundaries are? So I would certainly, so young, you know, it, I think again, it's very important to look at it in the context of the whole group, which is what the court says we should do in Temuv. And in this case, you know, the group exists because in Salvadoran society, young women are at risk from gang violence if they do not have a male, you know, family member to protect them. And so it's about Salvadoran society, it's understood there's record evidence that talks about, you know, this risk to young women from gangs in particular, that male family members are supposed to protect them. And it's not an older family member. So in this case, Christian is living with his grandparents, his three sisters, and three female cousins. His grandfather is very old. His grandfather is not the one who's going to be up going out and protecting, you know, his sisters and his cousin from gangs. It's on Christian, who is the young male of the family, to do that. But that's, I understand that. And factually, I get that. But we're supposed to look at the group and decide whether it meets the particularity requirement. And given that young is part of the group, how do I know what young is? I mean, is it age such and such and below? I mean, how do I know if someone's younger? I mean, you know, we've got a panel here, probably none of us are young, but some of us are younger than others. What's it mean? So I would certainly agree with the court that, you know, at the borders, perhaps young is amorphous. But I think in this case, and the majority of cases, it's very clear. So when this happens, Christian is in high school. When he applies for relief, I think he's about 20. Christian is now 25. He clearly falls within the boundaries of a young male. But is that our question, whether Christian falls within it, or is our question whether the group as advanced by your client has any contour so that we can tell who's in it and who's not? You may be right. I mean, Christian may fall in it quite naturally. But if it's, some people might say young is minors. And if that's the case, he's not. Isn't that our problem? We don't, with that group, we don't know really what the boundaries are. And if we don't know the boundaries, maybe he would have been in it almost under anyone. But how do we know what they are? So the question before the court is whether or not, it's, you know, you can look at a group and decide if there's a benchmark, I think is the language. What was the particular social group definition that was used in the Crespin-Valadares case? In Crespin-Valadares, the social group was relatives of those who testified against gang members, publicly testified. And your honor, that would be broader than this, wouldn't it? I think, I would, yeah, I would think that the Crespin-Valadares PSG is far broader. So relatives, you know, here, I know the government has argued that, you know, young male relatives of Christian's cousin Emily, relatives can be expansive. In Crespin-Valadares, relatives. Where did this young come from? Because if you look back at the PSG before the immigration judge, it didn't have that modified young in it. Immigration judge put it in the order. So what do we make of that? I mean, it doesn't look like the council came up with this group. It looks like that's kind of what was put in the order. Yes, so your honor, my understanding, there were various iterations that were proposed before the immigration judge. And obviously this is the one that she landed on. That's the one that the BIA considered and it's before this court because there were other iterations raised. You know, if the court thinks that we should look at something, you know, say without young, like male relatives. What the particular group was that was, when I look at the proposed particular social groups that were put before, none of those proposals had the word young in it. It came somewhere from the immigration judge. Yes, you know, I'm not, I'm not sure exactly the contours of how she, she brought that in. But again, I think, take a look at that differentiation. It seems like the council didn't bring this term into it initially. Yes. I mean, again, my understanding is that there were various groups that were proposed. And if, you know, if this court, I think we had a footnote about this in our brief, I think it was in our reply brief. If the court, you know, doesn't like this group, it could remand to consider one of the alternative formulations, for example, male relatives of Christian's cousin Emily without the young. I think, again, the young is important because I think I'm assuming the reason why the immigration judge put it in is because it was from Christian's testimony about Salvadoran society and it being common on younger male family members to protect their female relatives from gang violence. It was a limiting term to the thing, right? I mean, it's a limiting term to the group. As we've mentioned before, the Crespin case, and I'm shorthanded here, was broader than this. Exactly, Your Honor. We think so. It's very clear in this court's precedent that a family-based PSG is cognizable. And here we have not just a family-based PSG, we have additional limiting terms. We have young, we have male. But you could limiting it. I mean, I think Judge King's right. It does limit it and it's less broad than family members. But the issue is family members, we can figure out who's in and who's out. And once you put young in there, I don't know how you figure who's in and who's out. I might say Christian's in, okay, but that's not our test. Our test is whether, when you have a category, can we figure out who's in and who's out? I would respectfully submit that in the majority of cases, it would be very easy to figure who's in and who's out. So first of all, you have to have a male family member of Christian's cousin Emily. And then you're going to look at the family member and ask if they're young. And what if they're 35? I would submit that that's still young. I think that they're, you know, just because at the extreme margins, you know, maybe we're getting into the 40s, there might be some questions, doesn't change the fact that there are clear contours to the group. It's easy to apply. There's no question that applies to Christian here. What would be the problem just simply seeing male family members of his cousin Emily, which is what was proposed by the council? I mean, it seems like you wouldn't be up here answering questions about young if you didn't have that modifier up there. Yeah, I mean. You seem to be arguing vigorously that it should be in there. When it looks like to me, at least whoever this council was at the beginning didn't have it there. Well, Your Honor, I'm defending the I.J.'s decision. But I agree with you that male relatives. I understand that, but the I.J.'s decision has to comport with what you were asking for, even to the extent it did. And if it can be supported, not inconsistent with what was being asked for, it just had something additional in it that's not necessary. So even in defending the decision, if he puts in a word young, he says the I.J.'s decision is correct, but you don't need the word young in it. That's the argument that would be made. It wouldn't be, oh, we got to have young in there because Judge Qualibon is going to ask me about young over and over again. So I want to keep going back and forth on that. I don't follow that. Yeah, I mean, I'm not saying that young isn't there. I'm saying that's what the I.J. found, what the B.I. reviewed. But I'm only saying if everything he has in there can be supported with simply male, because that's what you asked for, I could see you saying alternatively, yeah, young is there, but it doesn't necessarily have to be there because we didn't even ask for it. So you could uphold this even by saying this is the particular group and it's supported by it. And I think that was making your argument. I'm just simply saying it. Well, I don't know why you keep going back and forth with Judge Qualibon on this young thing here when you didn't even ask for it. I'm certainly opening up your argument. That was the footnote in our, I think it was in our reply brief about the alternative formulations. Is there anything wrong with our precedent in that Crespin case? I mean, does the V.I.A. and the Attorney General hostile to that or anything? Hostile to what? Hostile to the definition that was used in the Crespin case. Crespin Valadares. I don't think. You just said family members. It's broader than what you have here. Exactly. And we proved that. I was on the panel. Yes. Judge Moss wrote the opinion. That was 2011. And as Judge Wynn points out, this added young male, whoever got in there, to family members. In Crespin, as I recall, it was family members. And that's exactly why we think that it's so clear. If Crespin is good law, this would have to be good. Exactly. That's exactly what we think. It's so clear that family-based PSG is sufficient. That's an interesting concept. I mean, I'm not quarreling with Crespin. I think family members of a group is an identifiable group. Anyway, let me ask you a separate question because we may just have. Judge Wynn talks about maybe it would have been more appropriate. Maybe you want to argue alternatively that male family members. But when you were answering my questions earlier, you were saying that young family members actually matters for the social distinction part. That it's young family members who are the ones who are expected to protect females from gang members. And so it sounded like that actually mattered to you on the other prong of our analysis. I want to say that being young mattered because it's very clear. Before you said the grandfather wouldn't be the one who would expect it to do it. It's got to be the young one. Well, I was trying to explain the factual context for how the PSG came out and how the immigration judge put young in there. But, you know, because it's very clear in Crespin that family members by themselves are socially recognizable. So there's no question. So, you know, young here, again, adds some more context to the Salvadoran society. It makes the group narrower. But I don't think it affects the analysis in any way. And again, I would point this court, you know, in Temu V. Holder, the PSG there was individuals who had been diagnosed with bipolar disorder and were erratic. And this court said that on their own terms, like it couldn't imagine that either of those were particular. And especially said that with being erratic, exhibiting erratic behavior, like how do you decide what that is, that that wouldn't qualify. But it said altogether there was no question that it did qualify. And that's exactly what we have here. Yeah, I think that's your best case. And, you know, what we've got to grapple with is that case in relation to Lizama and Zelaya, which really did focus more on, you know, some of the component parts. They looked at it as a group, but they said some of the component parts made it too amorphous. And, you know, I think those cases, figuring out how they align is an interesting question. So I think Temu, if I'm saying that right, is the right, you know, is probably your best case. And I mean, the other thing I would point to the court, too, is the BIA's own decision in the matter of Kazinga. This is cited in our briefing. You also have the subsequent matter of SEG, which I think, you know, is hard, which I think is a precedential decision. I can't remember if Kazinga was. Do you remember that? My understanding is that Kazinga is precedential, and that's the one where the BIA approved of a PSG of a young woman of a tribe who had not had female genital mutilation. So there it's young women. And so if the BIA itself is approving of PSGs with young women, I think that there's no question this court can approve a PSG that's young male. But SEG, you know, which is subsequent, I thought was precedential. I can check and may be wrong, talks about, you know, it actually says that, I can't remember the full group, but it had young in it, and it found that it was not particular. And so I don't think the BIA is like on, hey, young doesn't matter. I think that case has got to be considered, too, right? Yeah, but I mean, again, what matters most is this court's precedent, and it's clear under Creston that family-based PSGs are cognizable if you add in additional terms. That's not your, what's the authority that says if you have a group that's recognizable and you add additional terms, it's automatically particular? So I think that, you know, again, the particular, the whole analysis of a PSG is, you know, is this group limited? That's a particular analysis. So I think it just logically follows that if you have a group that is already particular and you add even more limiting terms, that it's necessarily particular. Is there a case that says that? If you have a group that is particular and broad, and you add terms that might mean fewer people are in it, but it's harder to tell the boundaries, is there something that says we have to find that as particular? Well, I mean, even in Creston, it was family members, but then it was family members of people who had testified publicly against gangs. So there was clear, and in other cases, the court has approved of PSGs that are just family members. So in Creston, you have additional language. I'm not, I just, I was, I don't mean to go on and on about this. I probably am. But I'm just trying to ask you a question, and if you, if there is one, that's great. If there's not one, that doesn't end things. But is there a case that says if you have a broad group that is particular, and then you have, add modifiers that may mean there are fewer people in it, but it makes the I'm not aware of a case that puts it in exactly those words, but there are multiple cases where you have something like a family-based PSG that has additional modifying terms added, and I would argue that's exactly what we have here. Okay, thank you. Let me answer this. What, the bottom line, what do you want us to do with this case? So we would request that you hold up the BI illegally aired by failing to apply this court's precedent, most, you know, obviously Crespin-Balderas, that family-based PSGs are legally cognizable, and that as a result, Christian is entitled to withholding of removal. We would ask that you not only grant the petition, but also that you reverse the BIA's decision and hold that he is eligible for statutory withholding of removal. So you want withholding of removable and cat relief? Correct. Correct. And what would that do for him? Because I understand that he is now in El Salvador. Yes. So under, there's an ICE directive. And it would go back to the BIA if we did that, right? I think that if you found that he was eligible for statutory withholding. No, no, no, no. Just answer my question. What would that do for him? So he is. If we grant, if we were to grant the two types of relief that you just said, withholding of removal and cat relief, it would go back to the BIA. What happens to him? He's still in El Salvador. It doesn't bring him back to the United States. If you hold that he is eligible for withholding of removal and cat relief, it goes back to the BIA to, I think, officially grant that. But then under an ICE directive, we are able to petition for him to be brought back. And someone who has, is granted relief so that they're eligible to the United States, ICE is required to then bring him back if we go through this petition process for that. And it would be helpful. You mean we can require the government to bring him back? Correct. I didn't know that. Yes. And we can, so there's an ICE. But you'd have to bring a separate petition to do that? So we, yes, there's a process to petition through ICE. So it wouldn't happen in this proceeding? So two things. So first of all, this court can enter in its opinion, it could direct that ICE bring him back, which automatically will speed things up with ICE. And if the court doesn't do that, we can go to ICE and ask that they do it. It's obviously much easier. We prefer cases where the court can order that and they do it? Yes, there are multiple cases where the court has ordered that. So I would direct the court to, and this, Ramirez v. Sessions. I'll refer to your papers. We'll find them. I just wasn't aware of it right now. Yes, this, we didn't actually address this in our papers, but there are multiple cases and I'm happy to submit a supplemental letter if that would be helpful. That'd be okay. But there was something else I wanted to ask you about. I can't remember what it was. Okay. Well, you can ask him. I'll come back to it. I don't know what it was. If you have to go through those proceedings, are you folks going to stick with him? I mean, he's got one of the best law firms in the world. And you've done a terrific job. But how long are you going to stick with this guy? So we have been with him for a long time. We have been with him through the IJ, the BIA, enough. I mean, I can't imagine us leaving him hanging now. We will continue to represent him. I just, I'm curious. I just appreciate what you've done. No, I mean, we did not just join this case of the fourth circuit to be very clear. Thank you. Thank you, Your Honor. Ms. Rourke, good to have you with us, Ms. Rourke. And you represent the Attorney General of the United States. I do. Thank you, Your Honor. May it please the court. The INA is clear. Not every person who is harmed in their country of origin or fears harm upon their return will qualify for one of the narrow forms of relief and protection from removal. Before the agency, Petitioner bore the burden of establishing a clear probability, not just that he would be persecuted, but that a protected ground would be at least one central reason motivating his persecutors to harm him. And a clear probability, not just that he would be before this court, Petitioner must show that the record is so compelling that no reasonable fact finder can deny him withholding a removal or cap protection, which we submit he cannot do. The first issue I would like to address is whether the extended family groupings that issue in this case satisfy the requirements of a particular social group. And at the outset, I think it's important to note the exact particular social group articulated by Petitioner, which is young male family members of his cousin, Emily. Not Emily's nuclear family and not Emily's would it satisfied if it didn't have the word young? We, so your honor, we would still think that Petitioner's group did not satisfy the requirements of particularity and social distinction, even if the group did not have the modifier of young. A claim based on family membership will often turn on the nature and degree of the relationships involved and how the society in question views those relationships. And that is why the board determined that his group does not quite fit the requirements of particularity and social distinction. Petitioner's main contention here is that this court's precedent. The cases as you look at them, and granted it seems that each one sort of turns on different types of facts, but we've been pretty open when it comes to family-based ones and simply say male members. Why is that? Does that fit in line with a number of cases where, as Judge King pointed out, there may be even broader classes? And granted, Judge King seems to be looking at this a little different than Judge Qualibon in terms of what that means to put young in. That looks like it's a subset where, on the other hand, it could be viewed as it's not a subset. What it is, it takes you out to examine an unknown. You don't know what the young is or what it is. So there's two different views on it. But if young is the problem here, if you took it off, does it satisfy this particular social group? Right. So we would argue that, or at least note that, a question of whether a particular social group exists in the society in question is an individualized fact-based inquiry, which is done on a case-by-case basis. But particularity is a question of law. We held that in a maya. And so particularity, I think Judge Wynn just logically is right. I think, you know, you know who males are. You know who family members are. It may be broader, but you can figure that out, right? So under a maya, I think that's probably particular. The question then is, is it socially distinct? And does society view, is there evidence that in El Salvador views that group as an actual group? Not a bunch of words that are put together, but a real group. And I mean, I would think if you hypothetically, I say it's hypothetically, maybe it's not hypothetically, you know, change this group from young males to males, probably is immutable, probably is particular. Yeah, the question then is there evidence that in society, not this neighborhood, it's viewed as a distinct group. Right, so we would argue even if the modifier of young goes away, in terms of social distinction, petitioner's case would still not satisfy the requirements of a particular social group. And I think it is telling in petitioner's opening brief, this is at page 38, they cite to a single source as evidence of social distinction. This is the UN Refugee Agency guidance note located at page 1576 of the Joint Appendix. Which discusses asylum claims for Central American asylum seekers, and it states that a family member of a gang or his sister could also be persecuted for reasons of his family membership. This evidence is insufficient to compel the conclusion contrary to the agency that petitioner's group is socially distinct first because it is the perspective of society as a whole that matters, not just that of the alleged persecutor, and because this article is not specific to Salvadoran society as a whole. It discusses gang violence in Central American countries, not just El Salvador. So we would think even if this court was inclined to find the group was particular, it would still fail on social distinction grounds. You know, there's no evidence that addresses how Salvadoran society perceives family or how extended family groupings are recognized in Salvadoran society. Is there evidence about, and y'all know the record better than me, and I didn't ask this to your colleague, I'll do that on rebuttal time, but is there evidence in the record, we talked a lot about particularity, but on social distinction, is there anything in the record about how society in El Salvador, young male family members? No, and that's the problem here is petitioner's evidence doesn't address what type of familial relationships are recognized by Salvadoran society in general is so significant that society distinguishes groups of people based on those type of relationships. So even if petitioner's group was limited to nuclear families or cousins, he still couldn't win because there's no evidence about it. The trouble with that though is we have cases that say nuclear family and family members are legitimate particular social groups. So maybe there's no evidence of that, but you've got to deal with our precedent. Here we've got something that I don't think is controlled by our precedent. So I think it's fair to see what the record says. Correct. It would still be an individualized case-by-case analysis in terms of the social distinction. The board has repeatedly held to establish a claim based on membership in a PSG. The applicant will be required to present evidence that the proposed group exists in the society in question. So we've been pretty strong on this family group. You look at the Crespin case, uncle and nephew is a cognizant group. We've held that, right? Correct, but that was that was that we're not just talking about nuclear families. Does it matter as to whether their uncle and nephew related by blood or by marriage? So the group in Crespin was actually family members of those who actively oppose gangs by agreeing to be prosecution witnesses. So it was not a group between an uncle. Which seems to me to be much broader than what you have here. Do you all accept our decisions as precedent? Yes. You do? Yes. I've had some of your colleagues come down here and they were very critical. Wanted the panel to change the precedent. Right, so we're not arguing that. So you accept Crespin? Right, we're arguing that it is distinguishable in terms of particularity. We feel that it did contain additional. So what's the distinction between this case and Crespin then in your view? So in terms of particularity, we would argue that there was additional limiting language in Crespin. And while the issue in Crespin certainly centered on a class of family members rather than persons who agreed to serve as witnesses, the court did not view those two classes in isolation from one another. As counsel is saying, you know, the point is to view the group as a whole. The court observed that we conceive a few more groups more readily identifiable than the family, and this holds particularly true for Crespin's family, given that Crespin and his uncle publicly cooperated with the prosecution of their relative's murder. And then in terms of social distinction. The distinction here seems to be, when you look back at what the factual findings that were made on this family, they talked about being known in the community, how they operated grocery store, and they lived there. And the board actually acknowledged that the group was socially distinct in the local community. Then it went and said, but the distinction is not throughout the country. I don't understand that for my precedent, because I'm not sure that's a requirement as it being country as opposed to there. And as has been noted, the problem we've got, we've got cases all over the place. When you start talking about particularity, you're talking about definable boundaries, which you can make sufficiently clear as to who is in and who is out. And when you're looking at this case, and determining, you know, you can turn the words on the stage and make it fit however you wanted to make it fit. You can say definable borders here refer to a single member of the family, Emily, who, and it excludes anyone who is not young. I mean, it actually makes it more particular as could be argued, because you're talking about a particular part of the family, young male members of that family. So, you know, it's odd, and this is where getting to be a judge gets to be I guess. It's just the way you say it is where I'm putting it. And so ultimately when we get here, we're going back and forth on this whole business of is this a particular family or not. But there are cases all over the place that would defy common sense as to why they don't all follow precedent of being in there. So why don't we just, I mean, why not just make it simple and say, okay, family base members make it. Then we get into the whole particularity context of it, and there's an argument as to whether, well, it seems like to me it's pretty particular to say, it seems more particular to me to say young male than to say male. Right, so the question is more particular. Right, so the question is. It is more particular because it excludes the females, right? Correct. Is it more particular? Is it more particular? Is it more narrow? Right, so again, we think the boundaries of petitioners group are. And you're saying you don't know what youth young means. You say you don't know what young means. The Attorney General of the United States over the years has used what Congress called the Youth Correction Act. I guess they still use it. When I was a prosecutor, we always had people talk. Issues, but applied the Youth Correction Act to young, mostly male, but didn't, they wasn't male, but young criminal defendants. And everybody knew that was 26 and under. The Attorney General enforced that. The Department of Justice, they applied that to people who came into the federal court system. Correct, that's who you're representing today, correct? So for the term youth, the board has long held that youth on its own does not have any strict objective boundaries. And going back to Judge Wynn's question, I'm thinking this is what he was getting at. So the question isn't whether petitioners specific family is recognized by society. It's whether the type of family relationships that are used to define his group are recognized by society. And I think that's important. So even if, yes, petitioner's family was well known in the community because they ran the store, they lived above the store, that's all well and good, but it does not address what type of relationships are recognized by Salvadoran society as so significant that they distinguish groups of people based on those types of relationships. So you buy in with the distinction that it should be a country type distinction, that the family unit can't be defined by a local? Not necessarily, your honor. I mean, when you think about different countries, you know that within the country itself, there can be different definitions. I might say that's true in the United States, but I won't say that. And with that argument, aren't you changing Crespin? With the social distinction, I don't think anything in Crespin said that, you know, unequivocally that all families... You're stretching it, you're altering it. You want us to change it? No, we don't think the court needs to touch Crespin. Again, we said it was distinguishable and I did discuss how it was distinguishable in terms of particularity, but also in terms of social distinction, the record in Crespin contained evidence of social distinction, including expert witness testimony that gangs murdered government witnesses and also intimidated witnesses by attacking their family members. There was also evidence that Salvadoran legislature had enacted special protective measures for those testifying against gangs, which suggested that society saw this group as specifically very vulnerable. Whereas here, again, there is that lack of evidence of social distinction. So I do think it is distinguishable from this court's decision in Crespin and we're not asking you to alter that. So counsel, let me switch here. We've been talking a lot about the withholding claim, but there's a CAT claim too. Correct. And in the CAT claim, you know, the IJ talks about a number of pieces of evidence and you in the BIA, you know, in I guess vacating or reversing the CAT claim, you know, talks about only two of those pieces of evidence. And your opposing counsel says, hey, that, you know, they didn't, you can't do that. You can't just selectively pick two and not consider all the evidence. What's your response to that? Right. So as we pointed out in our brief, the board is entitled to the presumption that it considered all relevant record evidence. And I think what the board was trying to do here was focus on the primary evidence that the immigration relied upon. These weren't safe. It would be a better, easier for you to argue that if it said, for example, two of the pieces of evidence they found are these two articles. Right. But the immigration judge inherited. And how do you not address credible testimony of Garcia, which is right there. He said he faced this prosecution by governmental actors. And you say, you looking at the big evidence, that's big for in terms of whether he feared prosecution that didn't even address it. How is that not something we would have to back? Right. So in petitioner's cat claim, the immigration judge found that he was only eligible for cat protection by aggregating the risk of torture from three different sources, which were the gangs, the gang extermination groups in the Salvadorian police, and that it was not more likely than not that he would be tortured by one of these sources alone. For this reason, the board noted this is in footnote four of footnote number four of the March 30th decision, that because police were the only public official from whom petitioner feared torture, the immigration judge had implicitly found that petitioner did not face a greater than 50 percent chance risk of torture by a public official, which would not require a showing of acquiescence. The board then turned to the remaining evidence, as Judge Quattlebaum was discussing, relied upon the immigration judge, which included two pieces of evidence, which the immigration judge devoted to full paragraphs to the main evidence that they had relied on as evidence of acquiescence. This was... Why do you say that's the main evidence that they relied on, on acquiescence? It was the evidence that the immigration judge discussed in depth, and it was the evidence that the immigration judge said that these are examples of when public officials turned a blind eye or acquiesced to torture. These were the two pieces of evidence she relied on to show that the likely response from a public official would satisfy the regulatory standard for acquiescence. So she did generally also discuss evidence about police abuses and extrajudicial killings, but that would be torture by a public official by the government itself. This is just the evidence that pertains to acquiescing to petitioner's torture either by the gangs or the gang extermination groups, and the board here that that did not satisfy the standard for acquiescence. If there are no further questions from the bench, I would respectfully ask that the court deny the petition for review and uphold the agency's denial of withholding of removal and cap protection, as well as its denial of petitioner's motion to reconsider. Thank you very much. Thank you. Ms. Roark, good to have you with us. Ms. Widener? Your Honor, I'd like to begin by addressing the CAC claim. So counsel for the government just said that the immigration judge found that any one of these three risks on itself was not sufficient. She didn't actually say that. I'm going to read her language. This is JA-1271. She says, the immigration court finds that the likelihood of torture may not be more than 50 percent for each individual threat. But here there were three threats. And so even assuming, and we strongly contest that, you know, we think that the BIA erred by finding that there was no acquiescence. But even assuming for a second that the BIA was right and that somehow the gangs were not one of the components for CAT, the BIA was then required under Rodriguez-Arias to go ahead and aggregate the risk of torture from the remaining two sources. And simply saying that any one of the three sources may not have been, you know, 50 percent or more doesn't get you, you know, each of them could have been 30 percent. So if you have two sources, that leads you to a 60 percent risk. So does that mean, I think I understand where you're going about the aggregation, but is it your position that if there's evidence that the petitioner is more likely to be tortured upon return, and that comes from three sources, each of which is under 50 percent, and only one of them is done with the acquiescence of a government that you win? Yes. But doesn't everything, doesn't all your evidence that, you know, supports that adds up to more than 50 percent have to be done with the acquiescence of government? No. So again, there are three sources that the IJA relied on in this case. So it's the 18th Street Gang, Salvadoran Police, and the Anti-Gang Vigilante Death Squads, who are composed of police members. And so for the two, for the police themselves and the Anti-Gang Vigilante Death Squads, acquiescence is not required because those are government officials who are acting. Exactly. And so even if you knock out, and we strongly disagree, and I'm happy to walk through the court, you know, how the BIA legally erred in dismissing the evidence of acquiescence, but even if you somehow agreed with the BIA that acquiescence, you know, that you take out the gang, those two other sources needed to be aggregated. And that was a clear legal error under Rodriguez-Arias, which says you have to evaluate the risk from all of the sources. The BIA never did that. The government doesn't address that on their briefs, so I would argue they've conceded that error. And so that, at a minimum, is a reason to grant the CAT claim. But we think that it's very clear when you look at the record as a whole, that... I'm sorry, counsel. You finished your point. I didn't mean to... I interrupted you. I want you to finish your point. I'm sorry. I was just going to say, when you look at the record as a whole, we think it's very clear that Christian is titled to CAT relief, as the IJ found. And, you know, the BIA ignored, as your Honor's of acquiescence. So in the BIA's decision, you know, they say there's only two pieces of evidence. When you look at the IJ's decision, she discusses six pieces of evidence, five of which supported Christian. That's not really fair. I think it's fair that... I don't mean to be as critical as that may sound, but it's... I mean, I think the BIA only talked about two pieces of evidence. The BIA didn't say there were only two pieces of evidence. I think it's a good point. You have a good argument that the way they did it, they didn't say, for example, and it could have been different. But then at the conclusion, you know, they're talking in a more collective way. Yeah, I'm at that. So, your Honor, this is the quote from the record. This is JA 969. They say, as proof of acquiescence, the immigration judge relied on two pieces of evidence. A 2019 Washington Post article, and then a 2019 article from a think tank. So they don't say even what your Honor is saying. They say two pieces of evidence. The IJ clearly discusses more, which we would argue illustrates that she looked at the entire record. And then beyond, and that's all country conditions evidence that we're talking about. There's also the evidence from Christian himself, the testimony about acquiescence. He testifies that the police in his neighborhood regularly take people and dump them in rival gangs' territories, and that's confirmed by the country conditions evidence. Can you answer the question, and I'm not, maybe JA cites or whatever is the best way to do it, but assuming we're sticking with young male family members of Emily, is there anything in the record that talks about how society as a whole now views the group of young male family members? So there are two pieces of evidence that I would point the court to. The first is Christian's testimony before the IJ. That's at JA 1292 to 1403, and that's where he talks about, you know, Salvadoran society. That's what the IJ primarily relies on when making this finding. But then I would also direct the court to JA 916, and that's an expert report. And there, I think it's either, I want to say it's an expert report, but it is, in that report, discusses how women in Salvador, how it's a patriarchal, machismo culture in El Salvador, and young women who, you know, are single and don't have family members face these heightened risks, which is exactly what I was talking about earlier, is that because of that, you know, because they're so vulnerable, the men and their family are expected to stand up. Thank you very much. If there are no further questions, we would ask the court to grant the petitioner for review and reverse the BIA's erroneous decisions. Thank you very, very much, Ms. Wagner. And we will come to the well of the court and Greek Council, and maybe we will take a short break.
judges: Robert B. King, James Andrew Wynn, A. Marvin Quattlebaum Jr.